UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSIE FERGUSON SMITH
o/b/o K.A.R.,

       Plaintiff,                              Civil Action No. 11-cv-11075

       v.                                    District Judge Paul D. Borman
                                              Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 13]**

Plaintiff Rosie Smith, on behalf of her minor granddaughter, K.A.R., challenges the final decision of Defendant Commissioner of Social Security ("Commissioner") to deny K.A.R.'s application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 12, 13), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge did not err in concluding that K.A.R. was less than markedly limited in the domain of attending and completing tasks. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On March 20, 2006, K.A.R.'s grandmother filed an application for SSI on K.A.R.'s behalf asserting that K.A.R. had been disabled since January 1, 2006. (Tr. 17.) The Commissioner initially denied that application on August 1, 2006. (Tr. 17, 49.) Plaintiff then filed a request for a hearing, and on August 25, 2009, she and K.A.R. appeared without counsel before Administrative Law Judge ("ALJ") Troy M. Patterson, who considered the case *de novo*. (Tr. 32-47.) In a September 4, 2009 decision, the ALJ found that K.A.R. was not disabled. (Tr. 17-28.) The ALJ's decision became the final decision of the Commissioner on January 10, 2011 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on March 15, 2011. (Dkt. 1.)

### B. Background

K.A.R. was ten years old at the time of the ALJ's disability decision but was six years old on the alleged disability onset date. (*See* Tr. 87.) She was born at 21 or 22 weeks gestation and weighed only one pound, three ounces. (Tr. 40.) K.A.R., and her two sisters, have been raised by her grandmother. (Tr. 41, 44.)

#### *1. The Hearing Before the ALJ*

K.A.R. testified briefly at the hearing. She told the ALJ that she would be starting fifth grade, that she had not been held back a grade, and that she liked school. (Tr. 39-40.) She also told the ALJ that she had no friends. (Tr. 40.)

K.A.R.'s grandmother testified that when she gained custody of K.A.R. in 2002 (when she was age two or three) she was not yet walking. (Tr. 41.) Plaintiff said that her biggest concern was that K.A.R. still wet her bed. (Tr. 41-42.) She also told the ALJ that K.A.R. would wet herself in

public. (Tr. 43-44.) Plaintiff described K.A.R. as a "sweet," "good" child, "but she will drift on you." (Tr. 42.) Plaintiff continued, "as far as learning, that's why I put her in the special [education] program, so [K.A.R.] could get one-on-one [instruction]. . . . [S]he's not up where the other kids [are] at because of her special needs. But we're trying to get up there." (Tr. 42.) Plaintiff said that K.A.R. gets along decently with her two sisters but that "[sisters would] be sisters sometimes." (Tr. 45.)

### 2. *Daily Activities Report*

On May 10, 2006, when K.A.R. was six years old, Plaintiff completed a report regarding K.A.R.'s daily activities. The report provides that K.A.R. woke at 7:30 a.m. and then washed her face, brushed her teeth, ate breakfast, dressed, and then went to school. (Tr. 121.) After school, K.A.R. played with her sister and 13-year-old cousin. (Tr. 121.) Regarding chores, Plaintiff said that K.A.R. made her bed, fed her dog, and "put things away." (Tr. 122.) These tasks were done well, but Plaintiff noted that "sometimes" K.A.R. needed instructions and required "occasional[]" supervision. (Tr. 122.) Plaintiff also provided that K.A.R. prepared simple meals such as pouring herself milk and making sandwiches (which sometimes required help). (Tr. 123.)

### 3. *Medical Evidence and Teacher Evaluations*

In October 2001, when K.A.R. was about 28 months old, K.A.R. underwent a Bayley Scales of Infant Development evaluation. (Tr. 150-155.) Barbara Halazon and Dr. Margaret Cappone, a psychologist, performed the evaluation. (Tr. 155.) K.A.R.'s mother reported that while she was pregnant with K.A.R., she suffered from toxemia as well as sickle cell. (Tr. 150.) She denied alcohol or drug use during pregnancy. (Tr. 151.) She reported that K.A.R. walked at 15 months, bottle fed until one year, and began speaking single words at one-and-a-half years. (Tr. 151.) Ms.

Halazon and Dr. Cappone found that K.A.R.'s mental developmental age was 22 months which was in the second percentile and represented "mildly delayed performance." (Tr. 154.) Her motor developmental age was similar: 24 months (ninth percentile) and also within the range of mild delay. (Tr. 154-55.) The evaluators found that K.A.R.'s "orientation engagement" score was within the "questionable" range, and attributed it to her "lack of enthusiasm and interest displayed at times." (Tr. 154.) K.A.R.'s emotional and behavior rating were within normal limits. (Tr. 154.) The evaluators diagnosed K.A.R. with a communication disorder, not otherwise specified, no diagnosis of mental retardation (noting K.A.R.'s performance was in the low-borderline range), and assigned K.A.R. a moderate-range Global Assessment Function score of 55.[1]

The next month, K.A.R. underwent a speech and language evaluation with Dr. Cappone and Cynthia Bradley, a speech and language pathologist. (Tr. 145-48.) The evaluators found that K.A.R.'s phonology was developing within normal limits and that her language scores and spontaneous language sample indicated development at normal pace. (Tr. 146.)

In December 2005, when K.A.R. was six years old and in the first grade, she underwent "a psycho-educational evaluation to determine eligibility for special education services." (Tr. 184.) Dale Petterson, Ed.S., a school psychologist, performed the evaluation. (Tr. 187.) Using the Weschler Intelligence Scale for Children (Fourth Edition), Mr. Petterson found that K.A.R.'s Full

---

[1]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("*DSM-IV*") 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32.

      A GAF of 55 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

Scale I.Q. was 67, exceeding only about one percent of children her age. (Tr. 185.) He remarked that "[K.A.R.] may experience great difficulty in keeping up with her peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities." (Tr. 185.) He also found that K.A.R.'s "ability to sustain attention, concentrate, and exert mental control is in the Extremely Low range" (better than only 0.2 percent of same-aged children). (Tr. 185.) However, K.A.R's academic functioning was higher than her I.Q. testing indicated. (Tr. 186.) In particular, on the Woodcock-Johnson Tests of Achievement-III, K.A.R. demonstrated basic academic skills at the 18th percentile. (Tr. 186.) Petterson found that K.A.R. could read a simple sentence and comprehend its meaning, and could complete some simple sentences in writing. (Tr. 186.) He noted that

> [o]verall, her performance on this test of achievement reveals a child whose achievement in the basic skills is significantly higher than expected for a child who is functioning within the Extremely Low range of intelligence. It is suspected that her scores on such a test will substantially decline in the near future as the complexity of the skills increase. Her reading, math and written language skills are at the 27th, 15th, and 43rd percentiles, respectively.

(Tr. 186.) Petterson concluded that K.A.R. did not qualify for special education under the category of special learning disability but he apparently found that K.A.R. met all of the cognitive impairment criteria except her reading and math scores were too high. (Tr. 187.) Petterson added, however, "[i]t is suspected that these scores will significantly decline on such a test within the next year or two." (Tr. 187.)

A few months later, in March 2006, an Individualized Education Program Team ("IEPT") completed a report regarding K.A.R.'s eligibility for special education. (Tr. 164-77.) K.A.R. was found eligible on the basis of a "cognitive impairment." (Tr. 165.) The IEPT provided, "[K.A.R.] is below [first-grade] level[,] and in some instances, below kindergarten level[,] across the

curriculum." (Tr. 175.)

On May 30, 2006, K.A.R.'s first-grade regular education teacher, Vonda Oliver, and her first-grade resource teacher, Penny Burnstead, completed a Teacher Questionnaire. (Tr 125-32.)[2] They provided that K.A.R. could read, write, and do math at kindergarten level. (Tr. 125.) Regarding five of the six domains of functioning relevant to child disability applications, K.A.R.'s teachers provided that K.A.R. had (1)"serious" problems in functioning related to acquiring and using information; (2) "slight" or "obvious" problems in areas related to attending and completing tasks; (3) "slight" or "obvious" problems in interacting and relating with others; (4) "no" problem in moving about and manipulating objects; and (5) "no," "slight," or "obvious" problems in caring for herself. (Tr. 126-30.) Regarding the sixth domain, medical conditions and physical well being, Ms. Oliver and Burnstead did not indicate any chronic physical condition and provided that K.A.R. did not frequently miss school due to illness. (Tr. 131.)

In July 2006, soon after K.A.R.'s seventh birthday, Julie Hartley, a Certified Clinical Competency-Speech-Language Pathologist, performed a speech and language evaluation on behalf of the State DDS. (Tr. 191-93.) Ms. Hartley found that K.A.R.'s receptive and expressive language scores were within normal limits, as was her articulation and fluency. (Tr. 191-92.) Ms. Hartley explained, however, that K.A.R. had difficulties with multi-step instructions:

During this evaluation, [K.A.R.] demonstrated comprehension of

---

[2]A Teacher Questionnaire asks a teacher to rate a claimant in a number of aspects, or subcategories, of five functional domains relevant to step three of the child's disability determination: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, and (5) self-care. The questionnaire also asks the teacher to answer questions regarding a sixth domain: health and well-being. The questionnaire's scale escalates as follows: "no problem," "a slight problem," "an obvious problem," "a serious problem," and "a very serious problem."

> age-level vocabulary given picture cues and understanding of grammatical sentences. She followed directions for testing without difficulty. However, it was noted several times during the evaluation that [K.A.R.'s] attention and ability to retain more than one piece of information was often limited. She looked down at the floor, played with her hands, or looked toward the wall on several occasions when the examiner was giving multi-step directions. [She] often asked questions about the directions or asked for repetition and sometimes completed the first step of the direction, but forgot subsequent steps. It was noted that [K.A.R.] often required repetition of the steps or single directions given one at a time to complete a task. Therefore, while [K.A.R.'s] score on the TOLD-P:3 [test] indicated that her receptive language skills are adequate according to her age, [her] comprehension of information presented in paragraphs or multiple steps appeared to be more limited. This deficit is likely to affect her ability to follow the routines and instructions in a classroom setting, especially with distractions such as noise and same aged peers present.

(Tr. 193.)

In the Summer of 2006, David Krohn and Dr. Art Dundon, completed a Childhood Disability Evaluation Form on behalf of the State DDS. (Tr. 194-99.) It appears that their evaluation was based on a review of nearly all of the evidence previously summarized. They found that K.A.R. did not meet or medically equal any listed impairment. (Tr. 194.) Regarding the functional domains, they found that K.A.R. had (1) "marked" limitation in acquiring and using information, (2) "less than marked" limitation in attending and completing tasks, (3) "less than marked" limitation in interacting and relating to others, (4) "no limitation" in moving about and manipulating objects, (5) "less than marked" limitation in self care, and (6) "no limitation" in health and well being. (Tr. 196-97.)

The record also contains an IEPT report from January 2009 when K.A.R. was in the fourth grade. (Tr. 204.) It appears that a Brigance Diagnostic Comprehensive Inventory of Basic Skills evaluation had been performed in October 2008 which showed that K.A.R.'s word recognition and

spelling were at the third-grade level with her reading comprehension and math grade placement at the second-grade level. (Tr. 206.) The IEPT report further provided that K.A.R. "needs additional time and shorter assignments when reading. . . . [K.A.R.] will not be successful in the regular education classroom. She will have too much difficulty keeping up with the pace of assignments and academic activities." (Tr. 206.) The IEPT assigned 15 hours of special education per week along with 15 hours of general education per week. (Tr. 207.)

### C. Framework for Disability Determinations

A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in "substantial gainful activity"; second, the child must have a "severe" impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To "meet" a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* Further, to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*,

348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not "meet" a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. § 416.926a; *see also Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003). "To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*, No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio 2009) (citing 20 C.F.R. § 416.926(a)). A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20 C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926.

Regarding functional equivalence, there are six "domains" that an ALJ must consider: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists

9

when the child has an "extreme" limitation in one of the six domains or "marked" limitations in two of the six. *See* 20 C.F.R. § 416.926a(d). A "marked" limitation results if the child's impairment(s) interferes "seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation exists when a child's impairment(s) interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since March 20, 2006 — the date of K.A.R.'s disability application. (Tr. 20.) At step two, the ALJ found that K.A.R. had the following severe impairment: low intellectual functioning. (Tr. 20.) Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment. (Tr. 20-21.) The ALJ then concluded that K.A.R. did not functionally equal a listing. (Tr. 21-27.) The ALJ's ratings in each of the six functional domains track that of DDS evaluators Krohn and Dr. Dundon with one, uncontested, exception: the ALJ found that K.A.R. had a "less than marked" limitation in the domain of health and physical well being whereas the DDS evaluators found that K.A.R. had "no" limitation in this domain. (*See* Tr. 27.)

**E. Standard of Review**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

Plaintiff raises a single point of error on appeal to this Court. She asserts that the ALJ erred in concluding that K.A.R. was less than markedly limited in the domain of attending and completing tasks. (Pl.'s Mot. Summ. J. at 6.) In making that finding, the ALJ reasoned that

> [t]he claimant's teacher reported problems in this area (Ex. 5E at 3) and psycho-educational testing [by Dale Pettersen, Ed.S.] pointed to deficits in memory and concentration (Ex. 3F at 25). However, the claimant can perform a wide range of daily activities: she attends to most personal care, dresses herself, prepares simple food, plays well with others, and performs various household chores, such as making her bed and feeding the dog (Ex. 4E). Additionally, she put forth good effort during evaluations and completed a battery of tests [in her evaluations by Mr. Pettersen and Ms. Hartley]. (Ex. 3F at 24; 6F).

(Tr. 24.) Plaintiff asserts that the evidence, properly considered, demands a finding of marked limitation.

In rating the attending and completing tasks domain, an ALJ is to consider how well the

12

claimant is able to focus and maintain her attention and her ability to complete her activities, including the pace at which the claimant performs activities and the ease with which she can change them. 20 C.F.R. § 416.926a(h). School age children (age six through age 11) should be able to focus "in a variety of situations in order to follow directions, remember and organize [their] school materials, and complete classroom and homework assignments." 20 C.F.R. § 416.926a(h)(2)(iv). The child should be able to "concentrate on details and not make careless mistakes in [her] work," "stay on task and in place when appropriate," and "sustain [her] attention well enough to participate in group sports, read by [herself], and complete family chores." *Id.*

The regulations provide some non-age-specific examples of limited (but not necessarily markedly limited) functioning in the attending and completing tasks domain. 20 C.F.R. § 416.926a(h)(2). These examples include: the claimant is "slow to focus on, or fail[s] to complete activities of interest," the claimant repeatedly becomes sidetracked from activities, or the claimant becomes "easily frustrated and give[s] up on tasks, including ones [she is] capable of completing." 20 C.F.R. § 416.926a(h)(2)(ii), (iii), (iv).

Plaintiff first asserts that some of the reasons the ALJ gave to support his "less than marked" rating in the domain of attending and completing tasks in fact correspond to other functional domains. (Pl.'s Mot. Summ. J. at 7.) For example, Plaintiff provides that "the fact that [K.A.R.] 'attends to most personal care [and] dress[]' deals with the domain 'caring for yourself.'" (*Id.*) The Court agrees with Plaintiff that some of the reasons the ALJ provided to support his attending and completing tasks rating better fit as justifications for his ratings in other functional domains. But that does not mean they are not also applicable in the domain of attending and completing tasks. Attending to personal care, dressing, preparing simple foods, and performing household chores, are,

13

as the ALJ reasonably recognized, tasks. K.A.R.'s ability to complete them is therefore probative of her ability in this domain.[3]

Turning next to the evidence before the ALJ, Plaintiff primarily relies on findings in two evaluations: Mr. Petterson and Ms. Hartley. Plaintiff emphasizes that the ALJ himself acknowledged, "'Objective testing by Dale Peterson, Ed.S., seems to show *marked limits* in concentration, *persistence, and pace* because Mr. Peterson concluded that the claimant had deficits in memory *and attention* and that she seemed to be developing at a rate approximately 2 standard deviations below the mean.'" (Pl.'s Mot. Summ. J. at 8 (quoting Tr. 23).) Plaintiff also points out that Petterson's I.Q. testing revealed that "'[K.A.R.'s] ability to sustain attention, concentrate, and exert mental control is in the Extremely Low range.'" (Pl.'s Mot. Summ. J. at 8 (quoting Tr. 185).) Regarding Hartley's evaluation, Plaintiff points out that she found that K.A.R. had difficulties following multi-step instructions: "It was noted that [K.A.R.] often required repetition of the steps or single directions given one at a time to complete a task. Therefore, while [K.A.R.'s] score on the TOLD-P:3 [test] indicated that her receptive language skills are adequate according to her age, [her] comprehension of information presented in paragraphs or multiple steps appeared to be more

---

[3]In fact, although tempered by the fact that K.A.R. was six-and-a-half years old at the time of her I.Q. test, the regulations provide the following age-group descriptor for the attending and completing tasks domain for children through age six:
> As a preschooler, you should be able to pay attention when you are spoken to directly, sustain attention to your play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. You should also be able to focus long enough to do many more things by yourself, *such as getting your clothes together and dressing yourself, feeding yourself, or putting away your toys*. You should usually be able to wait your turn and to change your activity when a caregiver or teacher says it is time to do something else.

20 C.F.R. § 416.926a(h)(2)(iii) (emphasis added).

limited." (Tr. 193.)

While the evaluations of Petterson and Hartley may support a finding that K.A.R. is markedly limited in the attending and completing tasks domain, the Court does not consider them in isolation. The question on appeal is whether substantial evidence supports the ALJ's determination that K.A.R. was "less than marked[ly]" limited in this domain. The Court concludes that it does.

First, Petterson's evaluation, insofar as it pertains to the attending and completing tasks domain, is somewhat mixed. Plaintiff points out that K.A.R.'s Working Memory Index – one of the four Wechsler Intelligence Scale for Children indexes – was 56 (in the bottom 0.2 percent). (Pl.'s Mot. Summ. J. at 8 (citing Tr. 185).) And, as noted, Plaintiff emphasizes that Petterson provided that this score evidenced K.A.R.'s limited ability to sustain attention and maintain appropriate pace. (*Id.*) But Plaintiff fails to note that Petterson's testing also revealed that K.A.R. "performed better than approximately 16 percent of her peers on the processing speed tasks," i.e., in the "Low Average range when compared to her peers." (Tr. 185.) The two indices are related, and more importantly, the processing speed index appears relevant to K.A.R.'s ability to timely complete tasks:

> The [Working Memory Index] is a measure of working memory. It assesses children's ability to memorize new information, hold it in short-term memory, concentrate, and manipulate that information to produce some result or reasoning processes. It is important in higher-order thinking, learning, and achievement. It can tap concentration, planning ability, cognitive flexibility, and sequencing skill, but is sensitive to anxiety too. It is an important component of learning and achievement, and ability to self-monitor. . . .
>
> The [Processing Speed Index] is a measure of processing speed. It assesses children's abilities to *focus attention* and quickly scan, discriminate between, and sequentially order visual information. It requires *persistence* and planning ability, but is sensitive to motivation, *difficulty working under a time pressure*, and motor

> coordination too. . . . *It is related to Working Memory in that increased processing speed can decrease the load placed on working memory*, while decreased processing speed can impair the effectiveness of working memory.

Richard Niolon, Ph.D., *History of the WISC IV*, http://www.psychpage.com/learning/library/intell/wisciv_hx.html (last visited Dec. 19, 2011) (emphasis added); *accord* Inderbir Kaur Sandhu, Ph.D, *F.A.Q. regarding The Wechsler Intelligence Scale for Children - Fourth Edition*, http://www.brainy-child.com/expert/WISC_IV.shtml (last visited Dec. 19, 2011).

In addition, Plaintiff does not discuss that Petterson found that, even with her "Extremely Low" ability to sustain attention and concentrate, K.A.R. performed better than expected in basic academic skills testing:

> Overall, [K.A.R.'s] performance on [the Woodcock-Johnson Tests of Achievement-III] reveals a child whose achievement in the basic skills is significantly higher than expected for a child who is functioning within the Extremely Low range of intelligence. . . . Her reading, math and written language skills are at the 27th, 15th, and 43rd percentiles, respectively.

(Tr. 186.) To the extent that Plaintiff would argue that Petterson questioned these findings, the Court notes that he merely "suspected" that K.A.R.'s scores "will substantially decline in the near future as the complexity of the skills increase." (Tr. 186.) No subsequent Woodcock-Johnson testing appears in the record proving Petterson's prediction. To the contrary, while in first grade, K.A.R. was performing at the kindergarten level (at least in some aspects of the curriculum) (Tr. 175), and, a few years later, in the fourth grade, she was performing at third- and second-grade academic levels, (Tr. 206). This does not suggest a significant worsening in her ability to perform basic academic skills.

Second, turning to Ms. Hartley's evaluation, it is not as clearly supportive of a finding that

16

K.A.R. was markedly limited in the domain of attending and completing tasks as Plaintiff suggests. As an initial matter, it is unclear whether her conclusions as to K.A.R.'s ability to carry out multi-step instructions were squarely within her expertise or her evaluation. Hartley is a Certified Clinical Competency-Speech-Language Pathologist and her evaluation was entitled "Speech & Language Examination Evaluation." (Tr. 191-93.) Next, Hartley's comments on K.A.R.'s ability to carry out multi-step tasks is tempered by the fact that when Hartley used the "formal assessment tool," K.A.R. "responded appropriately to questions in conversation and followed multiple-step directions." (Tr. 191.) Hartley stated, K.A.R. "required repetition for most multiple step tasks given out[side] the context of the formal assessment." (Tr. 191.) Finally, Hartley did not rate K.A.R.'s ability to attend and complete tasks. It is less than certain that Hartley would have concluded that K.A.R. was markedly limited in this domain: "while [K.A.R.'s] score on the TOLD-P:3 [test] indicated that her receptive language skills are adequate according to her age, [her] comprehension of information presented in paragraphs or multiple steps appeared to be more limited. This deficit is likely to affect her ability to follow the routines and instructions in a classroom setting, especially with distractions such as noise and same aged peers present." (Tr. 193.)

Third – and most importantly – other record evidence relevant to the domain of attending and completing tasks supports the ALJ's finding. *See* 20 CFR § 416.926a(e)(4)(ii)(B) ("[W]e may find that you do not have a 'marked' or 'extreme' limitation, even if your test scores are at the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is not seriously or very seriously limited by your impairment(s)."). As the ALJ found, K.A.R. was able to complete certain activities of daily living. K.A.R.'s grandmother noted that K.A.R., at age six, made her bed, fed her dog, and "put things

17

away" and that K.A.R. did these activities well but "[s]ometimes need[ed] instructions." (Tr. 122.) K.A.R.'s first-grade teachers found that while K.A.R. had "serious problem[s]" in all aspects of acquiring and using information, she merely had "obvious" or "slight" problems in the domain of attending and completing tasks. (Tr. 127.) For example, her teachers indicated that she had only a "slight" problem changing from one activity to another without being disruptive, and a "slight" problem in completing class/homework assignments. (Tr. 127.) The DDS evaluators, Mr. Krohn and Dr. Dundon, reviewed both Petterson and Hartley's evaluations, and found K.A.R. less than markedly limited in the attending and completing tasks domain. (Tr. 196.) Dr. Dundon was the only medical professional to explicitly rate K.A.R.'s domains of functioning.

Given the foregoing and considering the record as whole, *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992), while it may have been reasonable to conclude that K.A.R. was markedly limited in the domain of attending and completing tasks, the contrary conclusion was also reasonable. Therefore, the ALJ's finding should not be disturbed on appeal. *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion.").

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ did not err in concluding that K.A.R. was less than markedly limited in the domain of attending and completing tasks. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of

42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

### III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                            s/Laurie J. Michelson
                                            LAURIE J. MICHELSON
                                            UNITED STATES MAGISTRATE JUDGE

Dated: December 22, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 22, 2011.

                                            s/Jane Johnson
                                            Deputy Clerk